*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. J. LYDA, Minor.

UNPUBLISHED
November 3, 2022

No. 359601
Wayne Circuit Court
Family Division
LC No. 2020-000672-NA

Before: RONAYNE KRAUSE, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Respondent-father, Mauricio Joshua Lyda, appeals by right the trial court's order terminating his parental rights to the minor child, ML. The termination proceedings arose out of respondent's sexual assaults of ML's older half-sister, to whom respondent had been a caregiver and father-figure for many years. Respondent denied committing the assaults, but for purposes of this appeal, he does not challenge the trial court's findings that he did commit the assaults. Furthermore, respondent does not challenge the trial court's findings that statutory grounds for termination had been established by clear and convincing evidence. Rather, respondent only challenges the trial court's best-interests findings. For the most part, respondent relies on the undisputed fact that he had a strong, close, healthy, and nurturing emotional bond with ML. The trial court nevertheless concluded that the risk of harm to ML was unacceptably high, and it found termination in ML's bests interests. We affirm.

## I. BACKGROUND

The proceedings below involved three children: AM, AS, and ML, all of whom share the same mother, ALM. Respondent-father is the father of ML, the youngest child; the older children have other fathers. Petitioner sought to take jurisdiction over all three children because, in relevant part, AM had disclosed that respondent had sexually assaulted her on three[1] occasions, and ALM became verbally and emotionally abusive toward AM when AM attempted to tell ALM about the assaults. The petition alleged that respondent and ALM were partners and lived together.

---

[1] AM eventually testified to two sexual assaults, not three.

Petitioner sought, in relevant part, to terminate respondent's parental rights to ML. Respondent was allowed to have visitation with ML during the pendency of the proceedings.

At respondent's bench trial, most of the testimony came from AM. AM testified that respondent came into her life when she was eight or nine years old, and, before respondent assaulted her, he was like a father to her. She testified that respondent first sexually assaulted her when she was twelve years old. At the time, AM was living with respondent, her two siblings, respondent's mother, and five of respondent's mother's other children.[2] At that time, ALM had moved out and was living with an ex-boyfriend, for reasons unknown to AM. ALM simply left the children behind and in respondent's care. The assault happened at night, while AM was sleeping in the room in which ALM previously stayed. AM testified that she woke up with respondent on top of her with his penis inside her. She had fallen asleep wearing a t-shirt and basketball shorts, but when she woke up, her shorts and underwear were gone. She tried to get respondent off of her, but at that point the respondent's mother called for AM, so respondent "hurried up and got off of me, and I went downstairs." Respondent did not say anything during the assault. AM explained that she did not tell anyone in part because "I didn't want to see my sister go through what she's going through now," apparently referring to the termination proceedings, and in part because she felt nobody would believe her, especially not ALM. According to AM, ALM had a history of refusing to believe AM when AM told ALM about things members of respondent's family had said.

When the second assault occurred, AM was again living with the same individuals, albeit at a different address; this time ALM was temporarily not present because she was in jail for a few days. AM was in the room she shared with ML, although ML had gone downstairs before the assault occurred. Respondent came into the room smelling of liquor, looked over at AM, pulled her clothes off, got on top of her, and raped her; she tried to push him off while he told her to be quiet. AM was too scared to scream. Eventually, respondent stopped and AM ran downstairs. ALM got out of jail a day or two later, and two or three days after that, AM attempted to tell ALM what happened. Previously, AM's cousin had informed AM's aunt and uncle, who called ALM. ALM responded by asking AM if AM knew the difference between sex and rape, and she told AM that AM was a liar when AM attempted to describe details of what respondent did. AM's aunt and uncle took AM to live with her grandmother, but respondent and ALM would not permit AS or ML to be removed. AM saw ALM occasionally thereafter, but much of her interaction with ALM thereafter was negative, and she had no further contact with respondent. By the time of trial, ALM had apparently come to believe AM. ALM testified that she and respondent lived together for quite some time before either of the sexual assaults, and she had no prior reason to be concerned about respondent.

Respondent argued that there had been no allegations of any wrongdoing committed by respondent against ML, there was no physical evidence that respondent actually assaulted AM, and none of AM's testimony was corroborated. Furthermore, the assault allegations had been reported to the Wayne County Prosecutor, and almost two years later, there was nothing to suggest a criminal conviction was impending. He opined that a parent's rights should not be terminated

---

[2] The record does not clearly indicate how old respondent's mother's other children were.

on the basis of a single person's word when there were no allegations that the parent did anything wrong to the child at issue. Petitioner noted that it was common for there to be no physical evidence of sexual abuse, but AM's testimony was consistent and believable. It recounted that AM regarded respondent as a father figure, they had been residing together as a family for many years, and respondent sexually assaulted AM when she was twelve years old on two occasions. In addition to the principle that how a person treats one child may be indicative of how that person would treat another generally, respondent assaulted a sibling of his daughter, ML. Petitioner argued that AM's testimony was enough to establish grounds for the trial court to take jurisdiction over the children and statutory grounds to terminate respondent's parental rights. The lawyer-guardian ad litem concurred with petitioner.

The trial court ruled from the bench that statutory grounds for termination of respondent's parental rights had been established under MCL 712A.19b(3)(b)(*i*) [parent's act caused a sibling to suffer physical injury or physical or sexual abuse and reasonable likelihood child will suffer from injury or abuse if placed in parent's home], (3)(g) [failure to provide proper care or custody despite being financially able to do so], (3)(j) [reasonable likelihood child will be harmed if returned to parent's home], (3)(k)(*ii*) [parent abused sibling of child including criminal sexual conduct involving penetration and reasonable likelihood child will be harmed if returned to care of the parent], and (3)(k)(*ix*) [parent abused sibling of child as defined in MCL 722.622 and reasonable likelihood child will be harmed if returned to care of the parent. The matter then proceeded to a dispositional hearing that included a best-interests hearing for respondent.

The assigned foster care supervisor testified that ML was currently placed with her maternal grandmother, where she was doing well. Respondent's visits with ML were appropriate, ML looked forward to those visits, and ML and respondent had a strong emotional bond. However, ML was also placed with AM and AS, and it would be unacceptable for respondent to have continued contact with AM. Furthermore, although ML was apparently unaware of respondent's assault of AM, ML's feelings toward respondent might be affected if she understood what respondent did to AM. Furthermore, because respondent had been like a father to AM and had cared for AM for six years, it was likely that respondent would eventually also assault ML. The foster care supervisor opined that on balance, it would be in ML's best interests for respondent's parental rights to be terminated. A report from the Clinic for Child Study was admitted into evidence without objection. In relevant part, the clinician who interviewed respondent noted that respondent seemed to have very low intellectual capacity and extremely poor operational judgment.[3]

---

[3] The report also acknowledged that respondent adamantly denied having committed the assaults, but it criticized respondent for showing no remorse or understanding of how the sexual abuse might have affected the family. We note that it would be self-contradictory to be remorseful for something one claims not to have done. See *People v Wesley*, 428 Mich708, 720-725 (BRICKLEY, J., joined by LEVIN, J.), 726-727 (CAVANAGH, J., joined by BOYLE, J.), 411 NW2d 159 (1987). Nevertheless, for purposes of this proceeding, it was established that respondent did commit the sexual assaults.

Petitioner argued that although the allegations might remain unproven in the criminal context, for purposes of this proceeding, AM had been found to be truthful about the two sexual assaults. Petitioner pointed out that respondent had been involved in the family for at least six years as a father figure, including when the mother was not around, and sexually assaulting AM twice "had really ripped this family apart, and we are in a scenario where [ML] could be at risk of harm if continued contact with father." Notwithstanding how well respondent's visits went, "if he could sexually assault [AM], who he treated like a daughter and has known since such a young age, there's no reason he couldn't do the same thing to [AS], or could do the same thing to [ML]." Particularly given his extremely poor decision-making skills, ML would be at risk of harm unless his parental rights were terminated. Petitioner acknowledged that ML was placed with a relative. The LGAL opined that the only scenario under which it might make sense not to terminate respondent's rights "would be a situation where [ML] was totally separated from the rest of her family; and in my scenario, in fact, she would be older." The LGAL also pointed out that respondent had in fact been bound over in the criminal matter. Respondent admitted that he had been bound over in the criminal matter, but he emphasized that a bindover was not based on the beyond a reasonable doubt standard. He argued that terminating his rights would be unfair given that he had a strong emotional bond with ML, and there was no evidence that respondent had done anything wrong regarding AS or ML.

The trial court ruled from the bench:

> The court, having found statutory grounds to terminate Mr. Lyda's parental rights to his child [ML], the Court now considers MCL 712A.19(b)(5) [*sic*], the best interest of the child [ML]. The court does find by a preponderance of the evidence, and based on the record as a whole, that terminating the parental rights of Mauricio Lyda to his child [ML], is in [ML's] best interest.

> The court notes that Mr. Lyda's sexual abuse has irreparably broken the family. The children are all placed – [ML's] been placed with her siblings together with maternal grandmother and are doing well in the maternal grandmother's care. So, the children are placed together. In most cases it's in the best interest of each child to keep siblings together.

> Again, Mr. Lyda sexually abused [ML's] older sister. He's damaged the integrity, health, and welfare of the family, and he presents an unacceptable risk to his child [ML]. A person, especially a parental figure, how the parent treats one child is strongly indicative of how that person will treat another child, including his own child. So, the Court is looking at the safety, security, and welfare, mental well-being of [ML].

> I note that [ML] has a bond with her father, but the bond with the father and the consideration of placement with relatives is significantly outweighed by the aggravating circumstances of the matter, and the unacceptable risk that Mr. Lyda poses to [ML], not to mention the integrity of the family, and the health of the children that are bonded as siblings.

So, parental rights are terminated with regard to Mauricio Lyda's parental rights to [ML], and the child so continues as a temporary court order [*sic*].

An order terminating respondent's parental rights was entered following the hearing. This appeal followed. Insofar as we can determine from publicly-available information, respondent has been charged with first-degree criminal sexual conduct in Wayne County case number 21-007458-01-FC, and that case remains pending.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

Respondent does not challenge the trial court's findings that statutory grounds for termination had been properly and adequately established. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The focus of the best-interests analysis is on the child's rights and interests, not the parent's rights and interests. *Id*. at 87-88. At this stage, "the parent has been found unfit, [so] the focus shifts to the child and the issue is whether parental rights *should* be terminated, not whether they *can* be terminated." *Id*. at 89. The trial court may, and should where appropriate, consider a multitude of factors, including the child's emotional bond to the parent, the parent's ability to parent, the child's needs for stability and permanency, the advantages of the child's current placement, and the child's age. *In re Sanborn*, 337 Mich App 252, 276-277; 976 NW2d 44 (2021). A child's placement with relatives weighs against termination of parental rights. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). However, sexual abuse of a half-sibling of the child who looked to a respondent as a parental figure is properly considered probative of how the respondent will treat his or her own child. *In re Mota*, 334 Mich App 300, 322-323; 964 NW2d 881 (2020).

Respondent challenges only the trial court's findings regarding ML's best interests. This Court reviews for clear error a trial court's determination regarding the child's best interests. *In re Olive/Metts Minors*, 297 Mich App at 40. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). Unpreserved issues are reviewed for plain error affecting respondent's substantial rights, meaning any error must be obvious and must have affected the outcome of the proceedings. *In re Sanborn*, 337 Mich App at 258.

## III. BEST INTERESTS

As an initial matter, respondent argues that the trial court should have considered evidence from ML's trauma assessment and therapy. Respondent makes no offer of proof on appeal as to what, specifically, that evidence might reveal. Rather, he offers only speculation that, perhaps, such evidence *might* have had some undefined value. "Without some indication of the substance of the testimony, it is not possible to tell if it was somehow so crucial to the case that its exclusion was error." *Matter of Green Charitable Trust*, 172 Mich App 298, 329; 431 NW2d 492 (1988).

Furthermore, respondent made no effort to have any such evidence introduced into evidence in the trial court, so this argument is unpreserved. See *Matter of Snyder*, 223 Mich App 85, 92; 566 NW2d 18 (1997); *In re Lang*, 236 Mich App 129, 135; 600 NW2d 646 (1999); *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). In any event, "error requiring reversal cannot be error to which the aggrieved party contributed by plan or negligence." *Farm Credit Services of Michigan's Heartland, PCA v Weldon*, 232 Mich App 662, 683-684; 591 NW2d 438 (1998). Even if this argument was reviewable, which is doubtful, respondent offers nothing in support of this argument. See *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

Nevertheless, although not stated outright, the record indicates that ML underwent a trauma assessment and is in therapy specifically due to the loss of her relationship with respondent. It is a fair inference that any evidence from ML's trauma assessment and/or therapy would reveal only what was already obvious from the record: that ML and respondent shared a close, caring, nurturing, happy, and healthy emotional bond. Respondent never acted inappropriately toward ML or, insofar as anyone knew, in ML's direct presence. To all outward appearances, notwithstanding his low intellectual functioning, he was a good father to ML, at least so far and despite being an appallingly bad father to AM. Petitioner tacitly does not challenge that the relationship between ML and respondent, at least as the relationship was at the time of the best interests hearing, weighs heavily against termination of respondent's parental rights. Clearly, ML will suffer harm as a result of losing that relationship.

There is also no dispute that ML's placement with her maternal grandmother formally weighs against termination and must be expressly considered. *In re Olive/Metts Minors*, 297 Mich App at 43-44. However, that placement is only one of many factors the trial court must consider, and it is not dispositive if, after consideration of all factors, the trial court finds termination to be in the child's best interests. *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 358502), slip op at p 7. All other things being equal, it is also generally considered in the best interests of a child to keep the child with any siblings. *Foskett v Foskett*, 247 Mich App 1, 11; 634 NW2d 363 (2001). The evidence established that, due to respondent's sexual abuse of AM and the fact that all three children were placed together and apparently wanted to stay in that placement, AM would have to be removed from her placement with her maternal grandmother if respondent's parental rights were not terminated. The trial court properly recognized AM's placement with a relative. However, under the particular circumstances of this case, that placement was incompatible with respondent retaining his parental rights, so it was not *practically* a consideration that could weigh against termination.

Therefore, ML's best interests essentially came down to a balancing act between only two real considerations: the danger that she would suffer harm from the cessation of her healthy and close relationship with respondent, and the danger that she would suffer future sexual abuse perpetrated by respondent. Regarding the probability of future sexual abuse, this Court has recognized that the doctrine of anticipatory neglect may be inapplicable where the other abused child is situated radically differently from the child at issue. *In re LaFrance Minors*, 306 Mich App 713, 730-732; 858 NW2d 143 (2014). However, ML is not situated so differently from AM. As petitioner points out, respondent was a caring and seemingly appropriate father-figure and caregiver to AM for many years while AM was younger. Put another way, before she was twelve years old, respondent did nothing inappropriate to AM, so the fact that he has *not yet* done nothing inappropriate to ML is not especially probative. Where a parent has raised a child's half-sibling

as if the half-sibling were his own daughter, the parent's sexual abuse of that half-sibling *is* highly probative of how the parent may treat the child. *In re Mota*, 334 Mich App at 322-323. Furthermore, there was evidence that respondent had low cognitive functioning and poor judgment, which suggests a higher probability that he would repeat the same harmful behaviors in the future.

This Court's review is deferential: the trial court's determination should not be reversed unless this Court is *definitely and firmly convinced* that the trial court made a mistake. Balancing the two risks of harm in this matter could not have been easy. However, if respondent eventually sexually assaults ML in the same way he sexually assaulted AM, then ML will lose her relationship with respondent in an even more traumatic manner. Furthermore, sooner or later, ML would learn that respondent sexually assaulted AM, and there was testimony indicating that such knowledge would probably harm her relationship with respondent in any event. The trial court ultimately chose to gamble on a possible harm against which ML was already being cushioned by therapy and a healthy placement with her grandmother and siblings. We cannot say that it was *definitely* a mistake for the trial court to decide against gambling on the other option, which was a disturbingly high probability that respondent would sexually assault ML when ML was a few years older.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kathleen Jansen
/s/ Christopher M. Murray